# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **TOLLIE D. MOORE,** | ) | |
| Plaintiff | ) | |
| v. | ) | Civil Action No. 2:14cv00048 |
| | ) | **MEMORANDUM  OPINION** |
| **CAROLYN W. COLVIN,** | ) | |
| **Acting Commissioner of** | ) | |
| **Social Security,** | ) | By:   PAMELA MEADE SARGENT |
| Defendant | ) | United States Magistrate Judge |

## I. Background and Standard of Review

Plaintiff, Tollie D. Moore, ("Moore"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying his claims for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. §§ 423 and 1381 *et seq.* (West 2011 & West 2012). Jurisdiction of this court is pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). This case is before the undersigned magistrate judge upon transfer by consent of the parties pursuant to 28 U.S.C. § 636(c)(1). Neither party has requested oral argument, therefore, this case is ripe for decision.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may

Case 2:14-cv-00048-PMS   Document 15   Filed 06/01/16   Page 1 of 37   Pageid#: 900

be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Moore protectively filed his applications for SSI and DIB on May 9, 2011, alleging disability as of April 9, 2011,[1] due to lumbar spine arthritis; bulging discs; depression; anxiety; difficulty remembering and concentrating; difficulty being in crowds; neck pain; difficulty sleeping; high blood pressure; and tendonitis. (Record, ("R."), at 304-05, 308-12, 317, 322, 348.) The claims were denied initially and upon reconsideration. (R. at 208-10, 215-17, 221-23, 225-28, 230-35, 237-39.) Moore then requested a hearing before an administrative law judge, ("ALJ"). (R. at 240.) A hearing was held by video conferencing on June 20, 2013, at which Moore was represented by counsel. (R. at 71-106.)

By decision dated July 16, 2013, the ALJ denied Moore's claims. (R. at 55-65.) The ALJ found that Moore met the nondisability insured status requirements of the Act for DIB purposes through December 31, 2011. (R. at 57.) She found that Moore had not engaged in substantial gainful activity since April 9, 2011, the alleged onset date. (R. at 57.) The ALJ found that the medical evidence established that Moore had severe impairments, namely degenerative disc disease of the cervical/lumbar spine; left shoulder arthritis; affective disorder; anxiety disorder; and borderline intellectual functioning, but she found that Moore did not have an

_____

[1] Although Moore's DIB and SSI applications specify April 27, 2006, as his alleged onset date, this date was amended to April 9, 2011, the day after the ALJ's most recent decision, at Moore's June 20, 2013, hearing. (R. at 75-76.)

-2-

impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 57-59.) The ALJ found that Moore had the residual functional capacity to perform simple, repetitive, unskilled light work[2] that did not require more than frequent handling, fingering, feeling and overhead reaching; that did not require concentrated exposure to climbing ladders, ropes or scaffolds or working on vibrating surfaces, at unprotected heights or near hazardous machinery; that did not require more than occasional balancing, kneeling, crawling, stooping, crouching, climbing ramps or stairs and pushing/pulling with the upper extremities; and that did not require more than occasional interaction with the general public. (R. at 59-60.) The ALJ found that Moore was able to perform his past relevant work as a chip mixer at a paper plant. (R. at 63.) Based on Moore's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ also found that a significant number of other jobs existed in the national economy that Moore could perform, including jobs as a night cleaner, a mail routing clerk and a cafeteria attendant. (R. at 64-65.) Thus, the ALJ concluded that Moore was not under a disability as defined by the Act and was not eligible for DIB or SSI benefits. (R. at 65.) *See* 20 C.F.R. §§ 404.1520(f), (g), 416.920(f), (g) (2015).

After the ALJ issued her decision, Moore pursued his administrative appeals, (R. at 8), but the Appeals Council denied his request for review. (R. at 1-6.) Moore then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2015). This case is before this court on Moore's motion for summary

---

[2] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, he also can perform sedentary work. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2015).

Case 2:14-cv-00048-PMS   Document 15   Filed 06/01/16   Page 3 of 37   Pageid#: 902

judgment filed July 7, 2015, and the Commissioner's motion for summary judgment filed July 27, 2015.

## II. Facts

Moore was born in 1962, (R. at 78, 304, 308), which, at the time of the ALJ's decision, classified him as a "person closely approaching advanced age" under 20 C.F.R. §§ 404.1563(d), 416.963(d). He has a seventh-grade education and past work experience as a factory laborer and a roof bolter in a coal mine, a forklift operator in a warehouse and a worker in a board mill drying chips to make pressed wood. (R. at 78-80, 323.) Moore testified that he stopped working in the coal mine after suffering a work injury, for which he received Workers' Compensation benefits. (R. at 81.)

Moore stated that he was scheduled to undergo a decompression and fusion surgery on his back the month following the hearing. (R. at 81.) He testified that he had numbness in both legs, the right worse than the left. (R. at 95.) He stated that he could stand and sit for up to 20 minutes at a time and that his doctor had restricted him from lifting more than 8 or 9 pounds. (R. at 82.) Moore testified that he had to lie down daily for about an hour and that he slept only three or four hours nightly due to hand numbness and leg pain. (R. at 96-97.) He stated that he sometimes needed a cane when walking "a hundred yards or so," but that it was not doctor-prescribed. (R. at 81-82.) He also stated that he sometimes had difficulty with bathing and grooming due to pain. (R. at 86.)

Moore further noted that he experienced cramps in his neck, had tendonitis in both wrists and had gout. (R. at 82-83.) Moore stated that he took anti-

-4-

inflammatory medication for the tendonitis and wore braces "about 90 percent of the time" to immobilize his wrists, but he was not wearing them at the hearing. (R. at 82-83.) He stated that he had experienced difficulty with his grip due to the tendonitis for two or three years, and he had difficulty picking up smaller objects. (R. at 93.) Moore testified that he also had a pinched nerve in his neck, which caused his arms to go numb when he would lie down. (R. at 83, 94.) He stated that he was receiving no treatment for this at the time of the hearing due to a lack of insurance, although surgery had been mentioned. (R. at 83, 95.) He clarified that he was able to undergo back surgery because his treating physician, Dr. Kaur, set it up on a sliding fee schedule. (R. at 95.) Moore testified that he was in the first stage of black lung disease, but was not having too many breathing problems. (R. at 84.) He also stated that he suffered from hypertension and high cholesterol, which was controlled with medication at times, but noted that pain caused his blood pressure to rise. (R. at 91.) Moore testified that he was taking Lortab for pain, which helped if he would lie down after taking it. (R. at 91.)

Moore also testified that he had been diagnosed with anxiety and depression, for which he saw a counselor monthly, and for which he was taking Lexapro. (R. at 89-90.) He stated that he did not like to be around crowds. (R. at 89.) Moore reported that he had been on medication since attempting suicide two years previously. (R. at 90.)

Moore testified that he had no hobbies and did not do much throughout the day. (R. at 84.) He stated that, in the past, he had ridden four-wheelers, walked daily for exercise, hiked and fished, but had not done so since 2007 due to pain. (R. at 85.) Moore testified that he had lived with his brother since 2007. (R. at 85.) Moore stated that his brother did the cooking and cleaning. (R. at 85-87.)

However, he stated that he "watch[ed] after" his elderly mother, who lived approximately 140 miles away, about twice monthly for a week or two. (R. at 87-88.) Moore testified that his brother drove him there. (R. at 88.) He stated that, when there, his mother did the cooking, and her granddaughter cleaned for her twice a week. (R. at 88.) Moore stated that he drove when he felt like it, but did not drive as far as to his mother's house, noting that he drove to the grocery store and the pharmacy on occasion. (R. at 88-89.)

Asheley Wells, a vocational expert, also was present and testified at Moore's hearing. (R. at 98-105.) Wells classified Moore's past work as a roof bolter as medium[3] and semi-skilled, but, as performed, at the heavy[4] exertional level. (R. at 99.) Wells further classified Moore's past work as a chip mixer at the paper plant as light and semi-skilled and as a forklift operator as medium and semi-skilled, but, as performed, at the light exertional level. (R. at 99.) Wells testified that a hypothetical individual of Moore's age, education and work history, who could perform simple, repetitive, unskilled light work that required no more than occasional pushing and pulling with the upper extremities, no more than occasional climbing of ramps and stairs, balancing, kneeling, crawling, stooping and crouching, no more than frequent reaching overhead, handling, feeling and fingering of objects, which did not require concentrated exposure to hazardous machinery, unprotected heights, climbing ladders, ropes or scaffolds or working on

---

[3] Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If an individual can do medium work, he also can do sedentary and light work. *See* 20 C.F.R. §§ 404.1567(c), 416.967(c) (2015).

[4] Heavy work involves lifting items weighing up to 100 pounds at a time with frequent lifting or carrying of items weighing up to 50 pounds. If an individual can do heavy work, he also can do medium, light and sedentary work. *See* 20 C.F.R. §§ 404.1567(d), 416.967(d) (2015).

vibrating surfaces, and which did not require more than occasional interaction with the general public, could perform Moore's past work as a chip mixer. (R. at 100.) Wells also testified that such an individual could perform other jobs existing in significant numbers in the national economy, including those of a night cleaner, a mail routing clerk and a cafeteria attendant. (R. at 101.)

Wells next testified that the same individual, who could stand and walk for no more than two hours in an eight-hour day, could not perform any of Moore's past work. (R. at 101.) However, Wells testified that such an individual could perform other jobs existing in significant numbers in the national economy, including those of an inspector/tester/sorter, a packaging and filling machine operator, a production worker and a final assembler. (R. at 102.) Wells testified that the same individual, who also would be off-task 10 to 20 percent of the workday, would not be able to perform any of Moore's past work or any other work existing in the significant numbers in the national economy. (R. at 103-04.) Wells testified that there were no jobs that an individual could perform if he were expected to miss more than two days of work monthly. (R. at 104.) Wells further testified that an individual who could stand and walk for two hours and sit for one hour would be precluded from all employment. (R. at 105.) Likewise, Wells testified that an inability to climb, stoop, kneel, crouch and crawl would eliminate all employment. (R. at 105.)

In rendering her decision, the ALJ reviewed records from Piedmont Community Services; Highlands Neurosurgery; Stone Mountain Health Services; Appalachia Family Health Center; Wellmont Health System; B. Wayne Lanthorn, Ph.D., a licensed psychologist; Dr. Travis Burt, M.D.; Norton Community Hospital; Frontier Health; LabCorp; Wise County Behavioral Health Services;

Lonesome Pine Hospital; University of Virginia Medication Center; University of Virginia Hospital East; and Robert S. Spangler, Ed.D., a licensed psychologist. Moore's attorney submitted additional medical records from Appalachia Family Health Center and University of Virginia Hospital East to the Appeals Council.[5]

Moore saw B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist, on March 1, 2011,[6] at his attorney's referral, for a psychological evaluation. (R. at 431-40.) Lanthorn previously saw Moore on September 18, 2007, at which time testing revealed a full-scale IQ score of 74, and he diagnosed Moore with pain disorder associated with both psychological factors and general medical conditions, chronic; major depressive disorder, recurrent, moderate; generalized anxiety disorder; borderline intellectual functioning; and rule out alcohol abuse. (R. at 432.) Contrary to other places in the record, Moore informed Lanthorn in March 2011 that he quit school as a high school freshman, was retained twice and received special education services. (R. at 433.) Moore was then-currently receiving counseling services and medication through Piedmont Community Services. (R. at 434.) He displayed no clinical signs or symptoms associated with delusional thinking, ongoing psychotic processes or hallucinations. (R. at 435.) Moore reported continued depression even with medication and acknowledged that "some days are better than others," but he reported depression so severe on some days that he could do almost nothing. (R. at 435.) Moore stated that he preferred to be alone and that he no longer hunted or fished. (R. at 435.) He denied then-current

_____

[5] Since the Appeals Council considered and incorporated this additional evidence into the record in reaching its decision, (R. at 1-6), this court also must take these new findings into account when determining whether substantial evidence supports the ALJ's findings. *See Wilkins v. Sec'y of Dep't of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991).

[6] The court notes that Lanthorn completed this evaluation the month prior to Moore's alleged onset date and that the prior ALJ considered this evaluation in his decision. However, because the current ALJ discussed this evaluation in her decision, this court also will consider it.

suicidal or homicidal ideation, plans or intent. (R. at 436.) Moore also reported often feeling anxious, tense, on edge, shaky and nauseated, and he described fatiguing quickly, having a "terrible" memory, being distractible, having poor concentration and mind wandering and having difficulty initiating and completing tasks. (R. at 436.)

Lanthorn administered the Minnesota Multiphasic Personality Inventory – Second Edition, ("MMPI-2"), which indicated that Moore was very depressed and had significant anxiety. (R. at 437.) Lanthorn opined that Moore's psychopathology was quite serious and included confused thinking, difficulties with logic and concentration and impaired judgment. (R. at 437.) Test results also indicated that Moore was experiencing comparatively severe emotional distress and difficulty with concentration, memory problems and difficulty making decisions. (R. at 438.) Lanthorn diagnosed major depressive disorder, recurrent, severe; anxiety disorder with both panic attacks and generalized anxiety due to chronic physical problems, pain, etc.; pain disorder associated with both psychological factors and general medical condition, chronic; and borderline intellectual functioning; and he placed Moore's then-current Global Assessment of Functioning, ("GAF"),[7] score at 45 to 50.[8] (R. at 438-39.) He opined that, from a psychological standpoint, Moore's difficulties were fully credible, and he strongly encouraged him to continue with psychiatric and psychotherapeutic intervention. (R. at 439.) Lanthorn noted that Moore's functioning had worsened since 2007.

---

[7] The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994).

[8] A GAF score of 41 to 50 indicates that the individual has "[s]erious symptoms … OR any serious impairment in social, occupational, or school functioning. …" DSM-IV at 32.

(R. at 439.) He concluded that Moore's psychopathology represented a substantial limitation and prevented him from sustaining gainful employment at that time. (R. at 440.)

Lanthorn also completed a work-related mental assessment, finding that Moore had a limited, but satisfactory, ability to understand, remember and carry out simple job instructions; a seriously limited ability to follow work rules; to maintain attention/concentration; to understand, remember and carry out detailed, but not complex, job instructions; and to maintain personal appearance; and no useful ability to relate to co-workers; to deal with the public; to use judgment; to interact with supervisors; to deal with work stresses; to function independently; to understand, remember and carry out complex job instructions; to behave in an emotionally stable manner; to relate predictably in social situations; and to demonstrate reliability. (R. at 709-11.) Lanthorn based these findings on his diagnoses of Moore, stated above, and he opined that Moore would be absent from work an average of more than two days monthly.  (R. at 709, 711.)

Moore saw Dr. William M. Platt, M.D., at Highlands Neurosurgery, P.C., on April 13, 2011, with complaints of chronic back pain. (R. at 442-43.) Dr. Platt noted Moore's diagnosis of lumbosacral strain superimposed on lumbosacral spondylosis after suffering a work injury in December 2005. (R. at 442.) He opined that Moore was at maximum medical improvement with permanent partial impairment. (R. at 442.) Dr. Platt noted that Moore did well on Lortab. (R. at 442.) Although Moore had called the office for a refill on March 29, 2011, Dr. Platt calculated that he should have had enough Lortab to get him through the date of the office visit. (R. at 442.) Moore rated his pain as an 8 on a 10-point scale, which worsened with walking long distances, bending over and lifting much. (R. at 442.)

-10-

He stated that he could do very little and was not able to work, exercise or walk very far. (R. at 442.) However, Dr. Platt found that "there is not a lot of objective evidence of injury," and he noted that, when he asked Moore specifically about his pain, it "[took] him a while to come up with an answer." (R. at 442.) Moore described his low back pain and right leg pain as constant. (R. at 442.) He stated that he could perform his activities of daily living, but did not do much housework. (R. at 442.) On physical examination, Moore could "come sit-to-stand," he could flex about 30 degrees, but did not extend, and he had pain in the right SI joint. (R. at 442.) Dr. Platt diagnosed lumbosacral strain and pain in the pelvic region and right thigh, and he administered an injection in the right SI joint. (R. at 442.) Dr. Platt prescribed Lortab, advising Moore that he would perform a pill count and drug screen follow-up. (R. at 443.)

Moore saw Dr. TaranDeep Kaur, M.D., his treating physician, at Appalachia Family Health Center, on May 23, 2011, for a routine medication check. (R. at 453-55, 681-83.) A pill count produced 18 Lexapro pills. (R. at 453, 681.) His blood pressure was described as "up and down." (R. at 453, 681.) Moore was fully oriented with normal memory, mood and affect. (R. at 454, 682.) Some swelling of the extremities was noted. (R. at 454, 682.) He reported being bothered nearly every day by little interest or pleasure in doing things, as well as feeling down, depressed or hopeless. (R. at 456.) Moore was diagnosed with hypertension, dyslipidemia and depression, and he was continued on Lexapro. (R. at 455, 683.)

On June 28, 2011, Moore returned to Dr. Platt for a follow-up visit after a June 16, 2011, urine drug screen was positive for Oxycodone, which he was not prescribed. (R. at 566.) A blood serum drug abuse panel was negative for opiates, despite Moore being prescribed Lortab. (R. at 566.) Dr. Platt stated that, more than

likely, he would continue to follow Moore for musculoskeletal pain, but would not prescribe opiates. (R. at 566.)

When Moore saw Dr. Kaur on June 28, 2011, he noted that his blood pressure was better, but complained of neck and back pain. (R. at 583, 678-80.) On August 1, 2011, he complained of not sleeping well and worsened neck pain that radiated into his back between his shoulders over the previous few days. (R. at 580-82, 675-77.) Moore stated that he was going to see Dr. Kotay for a surgical consult. (R. at 580, 675.) Physical examination revealed normal extremities and full orientation with normal memory, mood, affect and judgment/insight. (R. at 581, 676.) Dr. Kaur diagnosed neck pain and hypertension, and she prescribed Prednisone. (R. at 582, 677.)

That same day, Dr. Kaur completed a physical assessment of Moore, finding that he could lift and/or carry items weighing up to 5 pounds occasionally and up to 10 pounds frequently and that, due to neck pain with radiculopathy, he could stand/walk for a total of two hours in an eight-hour workday and sit for a total of one hour in an eight-hour workday. (R. at 570-72.) She further found that, due to impingement as shown on an MRI, Moore could never climb, stoop, kneel, crouch or crawl, but could frequently balance. (R. at 571.) Dr. Kaur found that Moore's abilities to reach, to handle, to feel and to push/pull were affected by his impairment due to decreased strength in the upper extremities, which was confirmed by an MRI and exam. (R. at 571.)She further found that Moore had restrictions on his abilities to work around heights, moving machinery, chemicals, dust, fumes or vibration because he could not stay in humid environments due to some black lung, and he had decreased strength in the upper and lower extremities on examination. (R. at 572.) Dr. Kaur also noted that Moore suffered from lower

back pain and that he would be absent, on average, more than two days monthly due to his impairments. (R. at 572.)

On June 30, 2011, Dr. Michael Hartman, M.D., a state agency physician, completed a physical assessment of Moore in connection with his initial disability claims. (R. at 139-40.) Dr. Hartman found that Moore could lift and/or carry items weighing up to 20 pounds occasionally and up to 10 pounds frequently, that he could stand and/or walk, as well as sit, about six hours in an eight-hour workday, that he could push and/or pull up to the lift/carry limitations and that he could occasionally climb ramps, stairs, ladders, ropes and scaffolds, balance, stoop, kneel, crouch and crawl. (R. at 139-40.)

Howard S. Leizer, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), of Moore on July 12, 2011, in connection with his initial disability claims. (R. at 137-38.) Leizer found that Moore was mildly restricted in his activities of daily living, had moderate difficulties in maintaining social functioning and in maintaining concentration, persistence or pace and had experienced no repeated episodes of decompensation of extended duration. (R. at 137.) Leizer also completed a mental assessment of Moore, finding that he was moderately limited in his ability to carry out detailed instructions; to maintain attention and concentration for extended periods; to perform activities within a schedule, to maintain regular attendance and to be punctual within customary tolerances; to sustain an ordinary routine without special supervision; to interact appropriately with the general public; to get along with co-workers or peers without distracting them or exhibiting behavioral extremes; and to respond appropriately to changes in the work setting. (R. at 140-42.) In all other areas, Moore was deemed not significantly limited. (R. at 140-42.)

Leizer suggested simple, unskilled work due to major depressive disorder, recurrent, severe; anxiety disorder with both panic attacks and generalized anxiety; panic disorder; and borderline intellectual functioning. (R. at 142.)

Moore saw Dr. Kaur on three occasions between September 6, 2011, and January 10, 2012. (R. at 576-78, 666-68, 672-74.) Over this time, Moore complained of pain in the right arm up into the neck, right shoulder pain with a decreased range of motion, an inability to lie on the right shoulder and right SI joint pain radiating down the lateral side of the thigh and lower back pain. (R. at 576-78, 666-68, 672-74.) A physical examination on September 6, 2011, revealed normal extremities. (R. at 577, 673.) Moore consistently had full orientation with normal mood, memory, affect and judgment/insight. (R. at 577, 667, 673.) Dr. Kaur diagnosed pain in the neck and right shoulder, dyslipidemia, back pain, sacroiliitis and hypertension, and she prescribed Flexeril and Lopid and administered a Depomedrol injection. (R. at 578, 668, 674.) The results of a urine drug screen were positive for Hydromorphone and Hydrocodone. (R. at 648.)

On January 12, 2012, Dr. Robert McGuffin, M.D., a state agency physician, completed a physical assessment in connection with the reconsideration of Moore's disability claims, finding that he could lift and/or carry items weighing up to 50 pounds occasionally and up to 25 pounds frequently. (R. at 171-72.) Dr. McGuffin found that Moore could stand and/or walk, as well as sit, about six hours in an eight-hour workday, that Moore's ability to push and/or pull was unlimited, other than the lift/carry restrictions, that he could occasionally climb ramps, stairs, ladders, ropes and scaffolds, balance, stoop, kneel, crouch and crawl and that he was limited in his ability to reach overhead bilaterally. (R. at 171-72.)

On January 17, 2012, Dr. Andrew Bockner, M.D., a state agency physician, completed a PRTF in connection with the reconsideration of Moore's disability claims. (R. at 169.) Dr. Bockner found that Moore was mildly restricted in his activities of daily living, had moderately difficulties in maintaining social functioning and in maintaining concentration, persistence or pace and had experienced no repeated episodes of decompensation of extended duration. (R. at 169.) Dr. Bockner also completed a mental assessment of Moore, finding that he was moderately limited in his ability to understand, remember and carry out detailed instructions; to maintain attention and concentration for extended periods; to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; to sustain an ordinary routine without special supervision; to interact appropriately with the general public; to get along with co-workers or peers without distracting them or exhibiting behavioral extremes; and to respond appropriately to changes in the work setting. (R. at 173-75.) Dr. Bockner concluded that Moore could perform simple, unskilled work due to major depressive disorder, recurrent, severe; anxiety disorder with both panic attacks and generalized anxiety; panic disorder; and borderline intellectual functioning. (R. at 175.)

Moore presented to the emergency department at Norton Community Hospital on March 20, 2012, with complaints of suicidal ideations for the previous two weeks. (R. at 589-99.) However, he noted that he had been out of Lexapro, which was helpful, for about three weeks. (R. at 589.) Moore's psychiatric status was deemed normal upon examination. (R. at 590.) Daphne Blanton, BS with Frontier Health, completed a mental status examination of Moore, finding that he had normal grooming and hygiene, was cooperative with normal speech, was moderately depressed with a blunted affect, had normal orientation, attention,

-15-

memory and thought processes, had no hallucinations, had good judgment and impulse control, had dangerous thoughts earlier in the day, but none then, and had past substance dependence. (R. at 633.) Moore was discharged home. (R. at 590.)

The next day, Blanton saw Moore for a mental health consult and completed a Screening/Crisis Intervention/Crisis Stabilization Assessment & Authorization. (R. at 627-30.) Moore reported that he was doing okay and was feeling better, denying any suicidal or homicidal ideation or psychosis. (R. at 628.) Blanton diagnosed Moore with major depressive disorder, single episode, moderate; and she assessed his then-current GAF score at 50. (R. at 628.) On clinical assessment, Moore was depressed and withdrawn with anxiety and sleep disturbance. (R. at 628-29.) Blanton noted that Moore had experienced a marked reduction in his psychiatric, adaptive or behavioral functioning or an extreme increase in personal distress after being out of Lexapro for two weeks until the previous day. (R. at 629.) However, she further noted that Moore received a prescription for a two-week supply of Lexapro in the emergency department and that he was seeing Dr. Kaur later that afternoon. (R. at 629.) Blanton concluded that Moore did not meet the criteria for hospitalization and/or commitment, and she recommended outpatient counseling and referral back to his primary care provider for medication management. (R. at 629.)

When Moore saw Dr. Kaur that evening, he reported that he had not been taking his Lexapro. (R. at 663-65.) He stated that he looked for his brother's medications to take as an attempt at suicide. (R. at 663.) Dr. Kaur found Moore fully oriented with normal memory, mood, affect and judgment/insight, she diagnosed hypertension and depression and gave him samples of Cymbalta. (R. at 664-65.)

Moore was seen for another Crisis Intervention screening on March 22, 2012, by Pamela Varner, RN with Frontier Health. (R. at 623-26.) He reported being very depressed, having lost interest in things he used to enjoy and having racing thoughts, but that he felt some better after Dr. Kaur increased his Lexapro dosage. (R. at 624.) He denied suicidal or homicidal thoughts, as well as hallucinations or paranoia. (R. at 624.) Varner diagnosed major depressive disorder, single episode, moderate; and she assessed his then-current GAF score at 50. (R. at 624.) On clinical assessment, Moore was depressed and withdrawn with appetite and sleep disturbance. (R. at 624-25.) Moore stated that he would return to stay with his mother in a few days and noted that felt like things were looking up. (R. at 625.) Varner found that Moore did not meet the criteria for hospitalization and/or commitment. (R. at 625.)

On April 10, 2012, Moore saw James Kegley, a social worker, for an intake assessment at Frontier Health. (R. at 601-22.) Moore reported depression and lack of energy, despite the increased Lexapro dosage, and he admitted getting "nervous and sweaty" whenever he was around many people. (R. at 601.) He stated that he did not participate in any leisure activities. (R. at 605.) Kegley found that Moore had age appropriate activities of daily living skills, but that he had experienced significant psychiatric decompensation in the previous three months. (R. at 606.) Moore endorsed mild tearfulness and moderate decrease in energy or fatigue; social withdrawal; anxiety; panic attacks; distractibility; memory impairment; poor attention or concentration; inability to maintain normal body weight; apathy; depressed mood; feeling worthless; helplessness; hopelessness; loss of interest or pleasure; low self-esteem; and insomnia. (R. at 610-12.) He noted recent suicidal ideation, but none then. (R. at 611.) Kegley diagnosed possible depressive disorder; and anxiety disorder, not otherwise specified, and he placed Moore's

then-current GAF score at 50. (R. at 614.) He found that Moore was of average intelligence or above. (R. at 614.) Kegley recommended that Moore begin individual and group therapy. (R. at 616.)

Also on April 10, 2012, Moore reported continued depression to Dr. Kaur after being back on Lexapro for two weeks. (R. at 660-62.) Moore again was fully oriented with normal memory, mood, affect and judgment/insight. (R. at 661.) Dr. Kaur diagnosed depression and planned to continue him on Lexapro for two to three more weeks before considering a medication change. (R. at 662.) His hypertension was stable. (R. at 662.)

On April 23, 2012, Moore again advised Kegley that he was unable to be in crowds, preferring to be by himself. (R. at 634.) He gave no indication of suicidal or homicidal ideation during the session. (R. at 634.) Moore's mood was mildly depressed with congruent affect. (R. at 634.) He continued to counsel with Kegley on May 15, June 4, and July 5, 2012. (R. at 692-94.) Moore reported that he probably could have continued working if allowed to work "high coal" because he would not have to bend over that much. (R. at 694.) He continually gave no indication of suicidal or homicidal ideation, and his mood was mildly depressed with congruent affect. (R. at 692-94.) He continued to report that being around people made him nervous all over, gave him "hot flashes" and that he could not "get out fast enough." (R. at 692-94.) Kegley challenged Moore to accompany someone to the grocery store or Walmart, which he did, but not for long. (R. at 692-94.) Moore stated his belief that his pain was a major contributing factor to his negative moods. (R. at 692.)

When Moore saw Dr. Kaur on July 6, 2012, he was fully oriented with normal memory, mood, affect and judgment/insight. (R. at 658.) Dr. Kaur deemed his depression and hypertension stable, continued him on Lexapro and gave him samples of Crestor. (R. at 659.)

Moore continued to treat with Kegley on July 24, and August 9, 2012, reporting that his depression "[was] not really good" and that it had been "pretty bad." (R. at 688-89.) He stated that the anxiety "is a hard thing to break," and he reported continued panic attacks. (R. at 688-89.) In August 2012, Moore continued to report anxiety when around larger crowds of people and having hot flashes over the previous several months with profuse sweating and shaking. (R. at 688.) However, in July 2012, he had reported going to the grocery store and Walmart with his girlfriend and mother two or three times since his prior session. (R. at 689.) Moore repeatedly gave no indication of suicidal or homicidal ideation, and his mood was mildly depressed with congruent affect. (R. at 688-89.) Kegley continued to encourage him to get out to the store and the library. (R. at 688-89.)

On August 29, 2012, Moore saw Dr. Kaur with complaints of constant bilateral back pain radiating down the leg to the medial side of the right foot, worse for the previous week and not helped by Aleve. (R. at 732-34.) On physical examination, Moore was tender in the right SI joint. (R. at 733.) He was fully oriented with normal memory, mood, affect and judgment/insight. (R. at 733.) Dr. Kaur diagnosed sacroiliitis and prescribed a six-day course of prednisone. (R. at 734.) She also gave him home exercises, but Moore refused an injection. (R. at 734.)

Moore continued to treat with Kegley from September 18, 2012, through February 21, 2013. (R. at 696-703.) Over this time, Moore described his depression as "up and down" and stated that he was "down most of the time." (R. at 702-03.) However, on November 13, 2012, he stated that Lexapro helped his depression and that he was able to get out more. (R. at 701.) On February 21, 2013, Moore stated that he was depressed all the time, noting his belief that his pain was the biggest cause of his depression. (R. at 696.) Moore continued to report that he could not tolerate a lot of people and that "crowds still tear [him] up." (R. at 698, 702.) He stated that Lexapro did not help his anxiety. (R. at 701.) Moore had not visited the library as Kegley suggested, and an attempt to hunt was unsuccessful. (R. at 702-03.) In November 2012, he stated that he would push himself to go to the grocery store before his next session, which he did. (R. at 698, 701.) Moore reported traveling to visit his mother and other relatives in Stuart, Virginia, on occasion. (R. at 703.) On January 7, 2013, Moore advised Kegley he was leaving that day for his mother's house to care for her during the winter months. (R. at 698.)  During this time, Moore repeatedly gave no indication of suicidal or homicidal ideation, and his mood was mildly depressed with congruent affect. (R. at 696, 698, 701, 703.)

Moore returned to Dr. Kaur on February 22, 2013, complaining of constant, chronic, left-sided lower back pain, which radiated to the right leg, and requesting an injection. (R. at 723-26.) He rated his pain as a 7 on a 10-point scale, aggravated by activity and walking, and which subsided when lying down. (R. at 723.)  Moore was awake and alert and in no acute distress. (R. at 725.) There was normal lumbar lordosis and normal range of motion of the lumbar spine, but tenderness and muscle spasms in the right lower back. (R. at 725.) The lumbar spine was

described as "stable." (R. at 725.) Straight leg raise testing and fabere sign[9] were positive, and Moore was tender in the SI area. (R. at 725.) He had appropriate judgment, good insight, proper orientation, intact recent and remote memory and a euthymic mood and appropriate affect. (R. at 725.) Dr. Kaur administered a hip injection to the right SI joint without complication, and Moore had mild relief within five minutes. (R. at 725, 727.) Dr. Kaur diagnosed depressive disorder, not elsewhere classified; and sacroiliitis, not elsewhere classified, among other things. (R. at 725.)

Moore returned to Kegley on March 25, 2013, again giving no indication of suicidal or homicidal ideation during the session. (R. at 756.) His mood was mildly depressed with congruent affect. (R. at 756.)

A lumbar spine MRI from April 19, 2013, showed a prominent right paracentral disc extrusion at the L2-L3 level, resulting in severe right lateral recess stenosis; grade 1 anterolisthesis of L5 on S1 with bilateral pars defects at the L5 level; and severe bilateral neuroforaminal narrowing at the L5-S1 level, slightly worse on the left. (R. at 713-14.)

On May 2, 2013, Dr. Kaur informed Moore that the MRI showed bulging discs at the L2-L3 level and the L5-S1 level. (R. at 716.) Moore rated his right-sided back pain as a 4 to 9 on a 10-point scale and noted an inability to do any activity due to back pain. (R. at 716.) On physical examination, Moore was awake, alert and in no acute distress. (R. at 718.) He had appropriate judgment, good

---

[9] Fabere sign, also referred to as Patrick's test, is used to determine the presence of arthritis in the hip. *See* DORLAND'S ILLUSTRATED MEDICAL DICTIONARY FOURTH EDITION, ("Dorland's"), 1522, 1688 (27th ed. 1988).

insight, proper orientation, intact recent and remote memory and euthymic mood and appropriate affect. (R. at 718.) Moore stated his willingness to undergo back surgery. (R. at 716.) Dr. Kaur again diagnosed depressive disorder, not elsewhere classified; sacroiliitis, not elsewhere classified; and unspecified backache; among other things. (R. at 718.) Dr. Kaur planned to refer Moore to University of Virginia, ("UVA"), for surgery, and she prescribed Lortab. (R. at 718.)

Moore saw Dr. Gregory Helm, M.D., a neurosurgeon at the Spine Center at UVA, on May 14, 2013, for a surgical consultation. (R. at 752.) Moore was grossly neurologically intact and had negative straight leg raise testing. (R. at 752.) Dr. Helm noted that the April 2013 lumbar MRI findings, and Moore decided to proceed with a surgical decompression and fusion on July 11, 2013. (R. at 752.)

Moore returned to Kegley on June 6, 2013, stating that he could not get over his anxiety and noting difficulty when in stores. (R. at 754.) He stated that "everybody moving" around him seemed to be a trigger and that he would break out in a cold sweat. (R. at 754.) Moore stated that he had become afraid of heights despite previously working for a cable company and climbing poles without difficulty. (R. at 754.) He gave no indication of suicidal or homicidal ideation, and his mood was mildly depressed with congruent affect. (R. at 754.) Kegley again challenged him to visit the local grocery store prior to his next appointment to push himself. (R. at 754.)

Robert S. Spangler, Ed.D., a licensed psychologist, completed a psychological evaluation of Moore on June 15, 2013. (R. at 759-62.) He was clean and appropriately dressed, cooperative and medicated. (R. at 759.) Moore had awkward gross motor movements and a slow, stiff gait secondary to chronic low

back pain, but age-appropriate fine motor skills and a slow general activity level. (R. at 759.) He seemed socially confident, but anxious and depressed. (R. at 759.) He generally understood the instructions for each task and demonstrated good concentration for 30 minutes, then erratic concentration secondary to pain. (R. at 759.) Moore was appropriately persistent on the tasks, but pace was impacted, and he stood frequently between tasks and shifted in his seat secondary to chronic low back and neck pain. (R. at 759.) He described chronic anxiety and depression symptoms, and he stated that he worried chronically to an unrealistic extent. (R. at 759.)

On mental status examination, Moore was alert and fully oriented with adequate recall of remote and recent events. (R. at 760.) He had fair eye contact, and his motor activity was tense. (R. at 760.) Moore's mood was depressed and anxious with an appropriate affect, and he was cooperative, compliant and forthcoming. (R. at 760.) Moore repeated two words after five minutes, seven numbers presented serially forward and five numbers presented backward. (R. at 760.) He could not perform Serial 7s or Serial 3s, but he did do Serial 5s adequately, and he interpreted common proverbs adequately. (R. at 760.) There was no illogical language or loose associations, he could spell "world" backward and forward, his judgment and insight were consistent with low average intelligence, his stream of thought was unremarkable, associations were logical, thought content was nonpsychotic and perceptual abnormalities were not noted except for slow speed. (R. at 760.) Moore appeared to be functioning in the low average range of intelligence and was emotionally labile secondary to chronic pain. (R. at 760.) He denied then-current suicidal or homicidal ideation, and delusional thought was not evident. (R. at 760.) Spangler found Moore to be credible. (R. at 760.) Spangler deemed Moore's social skills to be adequate, as he related well to

him. (R. at 760.) However, he found that Moore did not have the judgment necessary to handle his financial affairs if awarded benefits. (R. at 761.)

Spangler administered the Wechsler Adult Intelligence Scale – Fourth Edition, ("WAIS-IV"), on which Moore received a full-scale IQ score of 79, placing him in the borderline range of intelligence. (R. at 761.) Spangler also administered the Wide Range Achievement Test – Fourth Edition, ("WRAT-4"), which placed Moore at the 8.9 grade level in word reading and in sentence comprehension and the 5.1 grade level in arithmetic computation. (R. at 761.) Moore's pace was inadequate as objectively tested. (R. at 761.) Spangler diagnosed Moore with generalized anxiety disorder, mild to moderate; major depressive disorder, recurrent, moderate to severe; and borderline intelligence, and he placed his then-current GAF score at 50 to 55. (R. at 762.) He deemed Moore's prognosis guarded, noting that he need to continue mental health treatment for a period greater than 12 months. (R. at 762.)

Spangler also completed a work-related mental assessment, finding that Moore had a limited, but satisfactory, ability to maintain attention/concentration for 30 minutes; a seriously limited ability to follow work rules; to relate to co-workers; to deal with the public; to use judgment; to interact with supervisors; to function independently; to maintain attention/concentration for periods longer than 30 minutes; to understand, remember and carry out simple job instructions; and to maintain personal appearance; and no useful ability to deal with work stresses; to understand, remember and carry out both detailed and complex job instructions; to behave in an emotionally stable manner; to relate predictably in social situations; and to demonstrate reliability. (R. at 764-66.) He based these findings on Moore's borderline intelligence; erratic concentration after 30 minutes, moderate to severe;

-24-

marginal education math skills; limited education reading skills and comprehension; slow pace which impacted the ability to carry out simple tasks in a timely manner; major depressive disorder, recurrent, moderate to severe; and generalized anxiety disorder, mild to moderate. (R. at 765-66.) Spangler agreed with Lanthorn's finding that Moore could not sustain gainful employment. (R. at 766.) He opined that Moore could manage benefits in his own best interest and that he would be absent from work an average of more than four days monthly. (R. at 766.)

Moore advised Dr. Kaur on June 13, 2013, that he was looking forward to undergoing back surgery at UVA on July 11, 2013, and that Lortab had helped his pain. (R. at 768-70.) Moore's hypertension was stable at that time, and he was alert and in no acute distress. (R. at 768.) He had appropriate judgment, good insight, proper orientation, intact recent and remote memory and a euthymic mood and appropriate affect. (R. at 770.) Dr. Kaur diagnosed benign essential hypertension; other and unspecified hyperlipidemia; depressive disorder, not elsewhere classified; sacroiliitis, not elsewhere classified; and unspecified backache. (R. at 770.) She continued Moore on Lortab. (R. at 770.)

On July 3, 2013, Moore saw Choi Mei Adams, a nurse practitioner at UVA, for a sleep apnea consultation prior to his back surgery. (R. at 819-22.) Moore endorsed back pain, myalgias and arthralgias, as well as problems with memory, concentration, weakness and tingling, burning and/or aching in the legs at night, depression and anxiety. (R. at 820-21.) On physical examination, Moore was cooperative and in no acute distress. (R. at 821.) He had a normal gait with no cyanosis, clubbing or bilateral pretibial pitting edema of the extremities. (R. at 821.) He was alert and fully oriented with a normal mood and affect. (R. at 821.)

Case 2:14-cv-00048-PMS   Document 15   Filed 06/01/16   Page 25 of 37   Pageid#: 924

Adams ordered a polysomnogram, which was performed on July 5, 2013, at UVA by Dr. Paul M. Suratt, M.D. (R. at 810-17.) This study reveled moderate to severe obstructive sleep apnea with mild oxyhemoglobin desaturation. (R. at 811.) Dr. Suratt recommended treatment with a nasal CPAP machine. (R. at 811.)

On July 10, 2013, Moore saw Kimberly Skinner, PA-C, a physician's assistant at UVA, prior to his back surgery. (R. at 804-06.) On physical examination, he was alert and oriented with a normal gait, full strength, except H/F was 4/5 bilaterally, and normal muscle bulk, overall muscle tone and sensation to light touch. (R. at 806.) He had a normal mood and affect with normal behavior, judgment and thought content. (R. at 806.)

On July 11, 2013, Dr. Helm performed a posterior decompression and fusion with bilateral L5-S1 pedicle screw fixation without complication. (R. at 777-84.) Following the procedure, Moore was awake, alert and oriented, and he rated his pain as a 5 on a 10-point scale. (R. at 786.) Post-operative standing and supine x-rays of the lumbar spine showed no evidence of complication. (R. at 795.) Moore was discharged on July 14, 2013, at which time examination showed full strength and sensation. (R. at 796-97.) At that time, he rated his pain as a 2 on a 10-point scale. (R. at 801.) Moore's cognition and extremity range of motion were within functional limits, as demonstrated by his performance of basic activities of daily living. (R. at 801.) No impairments were noted in his motor control and coordination, and he could sit and stand independently. (R. at 801.) He was discharged home in stable condition and was advised to perform activity as tolerated, with the exception of no lifting over 10 pounds. (R. at 796, 798-99.)

On July 24, 2013, Moore returned to Dr. Kaur for suture removal. (R. at 48-51.) He reported that his right leg numbness was improving, but continued to complain about a lot of pain, not relieved by Lortab. (R. at 48.) On physical examination, Moore was alert and in no acute distress. (R. at 50.) There was no tenderness to palpation of the lumbar spine, he had normal range of motion, and the lumbar spine was "stable." (R. at 50.) Moore's mood was euthymic with appropriate affect, and he had appropriate judgment, good insight, proper orientation and intact recent and remote memory. (R. at 50.) Moore reported that over the previous two weeks, more than half of the time he had had little or no interest in doing things, and several days he had felt down, depressed or hopeless. (R. at 50.) Dr. Kaur diagnosed unspecified backache, and she prescribed Percocet. (R. at 50-51.)

Moore continued to treat with Dr. Kaur from August 12, 2013, through March 25, 2014. (R. at 11-47.) On August 12, 2013, Moore complained of severe, constant right foot pain of three days' duration, which he attributed to gout. (R. at 44-47.) He was alert and in no acute distress. (R. at 46.) There was erythema of the right lower extremity and tenderness to palpation, but range of motion was normal without joint instability. (R. at 46.) Dr. Kaur diagnosed gouty arthropathy, unspecified, and she prescribed Indomethacin and prednisone. (R. at 46.) However, on August 21, 2013, Moore complained of pain on the lateral side of the right leg and a stinging and burning pain in the foot, not relieved by medication or steroids. (R. at 36-39.) Moore again was alert and in no acute distress. (R. at 38.) The right lower extremity was normal with tenderness to palpation, but Moore had normal range of motion and no joint instability. (R. at 38.) He was very tender to touch on the lateral side of the right leg. (R. at 38.) Dr. Kaur ordered x-rays and prescribed Neurontin. (R. at 38.) These x-rays showed soft tissue swelling

proximal to the fifth metatarsal with foreign body suspicious for a piece of glass in the right foot. (R. at 35.) X-rays of the right tibia and fibula were normal. (R. at 35.) By September 20, 2013, Moore reported a continued inability to walk, and he was limping, but he advised that his back pain was controlled with Neurontin, and he was in no acute distress. (R. at 30, 32.) His right lower extremity again was tender to palpation with normal range of motion and no joint instability. (R. at 32.) Moore remained very tender on the lateral side of the right leg. (R. at 32.) Dr. Kaur diagnosed pain in joint, lower leg. (R. at 32.)

From November 19, 2013, through January 22, 2014, Moore continued to complain of right leg numbness, and physical examinations were positive for tenderness in the right lower extremity to palpation and tenderness on the lateral side of the right leg. (R. at 15-18, 26-29.) However, range of motion was normal without joint instability. (R. at 17, 28.) Dr. Kaur diagnosed pain in joint, lower leg and prescribed medications. (R. at 17-18, 28.) By March 25, 2014, Moore stated that he was doing "fine" and was taking his pain medication as needed. (R. at 11-14.) His hypertension was stable. (R. at 11.)

Over this same time, Moore also complained of depression symptoms to Dr. Kaur. For instance, in July 2013, he reported that over the previous two weeks, he had little or no interest in doing things more than half the time, and several days he felt down, depressed or hopeless. (R. at 50.) Nonetheless, at each of the six visits over this time, Dr. Kaur found that Moore's mood was euthymic with an appropriate affect, and he had appropriate judgment, good insight, proper orientation and intact recent and remote memory. (R. at 13, 17, 28, 32, 38, 46.) Dr. Kaur diagnosed Moore with depressive disorder, not elsewhere classified. (R. at 13, 17, 28, 32, 38.)

### III. Analysis

The Commissioner uses a five-step process in evaluating DIB and SSI claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2015). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a) (2015).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B) (West 2011 & West 2012); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute

its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained her findings and her rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. §§ 404.1527(c), 416.927(c), if she sufficiently explains her rationale and if the record supports her findings.

Moore argues that the ALJ erred by improperly determining his residual functional capacity. (Plaintiff's Motion For Summary Judgment And Memorandum Of Law, ("Plaintiff's Brief"), at 6-8). Moore also argues that the ALJ erred by making incomplete findings at step three of the sequential evaluation process. (Plaintiff's Brief at 8-9.)

The ALJ found that Moore had the residual functional capacity to perform simple, repetitive, unskilled light work that did not require concentrated exposure to climbing ladders, ropes or scaffolds or working on vibrating surfaces, at unprotected heights or near hazardous machinery, that did not require more than

occasional balancing, kneeling, crawling, stooping, crouching, climbing ramps or stairs or pushing/pulling with the upper extremities and that did not require more than occasional interaction with the general public. (R. at 59-60.) Based on my review of the record, I find that substantial evidence exists to support the ALJ's finding with regard to Moore's residual functional capacity.

Moore argues that the ALJ, in arriving at her physical residual functional capacity finding, should have given more weight to the opinions of his treating physician, Dr. Kaur. I find this argument unpersuasive. The ALJ must generally give more weight to the opinion of a treating physician because that physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. 20 C.F.R. §§ 404.1527(c), 416.927(c) (2015). However, "[c]ircuit precedent does not require that a treating physician's testimony 'be given controlling weight.'" *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996) (quoting *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992) (per curiam)). In fact, "if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Craig*, 76 F.3d at 590.

Here, the ALJ stated that she was giving Dr. Kaur's opinion little weight, as it was not supported by the objective medical evidence of record. (R. at 63.) While Dr. Kaur found that Moore could lift and carry items weighing up to 10 pounds, sit no more than one hour and stand/walk no more than two hours in an eight-hour period, could not climb, stoop, kneel, crouch or crawl and had a limited capacity for reaching, handling, feeling, pushing, pulling and performing jobs involving exposure to heights, moving machinery, chemicals, dust, fumes or vibration, a November 2010 MRI showed facet joint arthritis and osteophytes from C3 to C7

with various degrees of impingement, but there was no evidence of herniated nucleus pulposus or spinal stenosis. Moreover, Dr. Platt noted in April 2011 that there was "not a lot of objective evidence of injury." At that time, Moore was able to "come sit-to-stand" and could flex to 30 degrees. Dr. Kaur's own treatment notes also do not support the harsh limitations he imposed upon Moore in the August 2011 assessment. For instance, treatment notes from May 23, 2011, reflect that Moore did not complain of back or neck pain, and Dr. Kaur imposed no restrictions on Moore's physical activities. Dr. Kaur's physical examination of Moore on August 1, 2011, revealed normal extremities, and Dr. Kaur again placed no restrictions on Moore's activities. Likewise, physical examinations by Dr. Kaur between September 6, 2011, and January 10, 2012, continued to reveal normal extremities. Thus, aside from the objective medical testing, Dr. Kaur's August 1, 2011, assessment is not supported by his own treatment notes from the same day.

I also find that it is not supported by the physical assessments of Moore completed by state agency physicians, Drs. Hartman and McGuffin, on June 30, 2011, and January 12, 2012, respectively. Dr. Hartman opined that Moore could lift/carry items weighing up to 20 pounds occasionally and up to 10 pounds frequently. He also opined that Moore could stand/walk, as well as sit, about six hours in an eight-hour workday, that he could push/pull up to the lift/carry limitations and that he could occasionally climb ramps, stairs, ladders, ropes and scaffolds, balance, stoop, kneel, crouch and crawl. Dr. McGuffin's findings echoed those of Dr. Hartman for the most part, except he found that Moore could lift/carry items weighing up to 50 pounds occasionally and up to 25 pounds frequently, and he opined that Moore was limited in his ability to reach overhead bilaterally. In his decision, the ALJ stated that he was giving great weight to the opinions of the state agency physicians, as they were consistent and well-supported. (R. at 62-63.)

A subsequent MRI in April 2013 showed an L2-L3 disc herniation, grade 1 anterolisthesis of L5 on S1 with bilateral pars defects at the L5 level and severe bilateral neuroforaminal narrowing at the L5-S1 level. However, Moore underwent back surgery to correct these issues on July 11, 2013, without complication. Moore's back and leg condition improved following surgery, and he consistently exhibited normal range of motion and no joint instability of the right leg. The record reveals that Moore's back pain was controlled with medication. "If a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986).

Moore also argues that the ALJ, in arriving at her mental residual functional capacity finding, should have given more weight to the opinions of psychologists Spangler and Lanthorn. Again, I find this argument unpersuasive. The ALJ stated that she was giving little weight to both of these opinions, as neither source was a treating psychologist, and their opinions were not supported by the objective or other medical evidence of record. (R. at 63.) In March 2011, Lanthorn opined that Moore's psychopathology prevented him from sustaining gainful employment. Without repeating all of their findings, Lanthorn opined that Moore had no useful ability to carry out the majority of work-related mental functions assessed, and Spangler opined that Moore had mostly either seriously limited or no useful abilities in these same areas. Lanthorn's assessment was completed in March 2011 and Spangler's in June 2013. Spangler agreed with Lanthorn's opinion that Moore could not sustain substantial gainful employment.

I first note that, despite Spangler's finding that Moore had a seriously limited ability to interact with supervisors and no useful ability to relate predictably in social situations, in his report, Spangler noted that Moore's social

skills were adequate, that he related well to the examiner, and he seemed socially confident. Spangler also found that Moore's memory was intact, that he had adequate recall of remote and recent events, and associations were logical. I note that Spangler's report and assessment are further inconsistent, as the report states that Moore does not have the judgment necessary to handle his financial affairs if awarded benefits, while the assessment states that he could handle benefits in his own best interest. Thus, at least parts of Spangler's mental assessment of Moore are inconsistent with his accompanying report.

Spangler's and Lanthorn's harsh restrictions also are not supported by the other substantial evidence of record. For instance, Dr. Kaur's treatment notes reflect that Moore's memory was normal, as were his mood, affect, judgment and insight. In February, May and June 2013, Moore's mood was even described as euthymic. Dr. Kaur treated Moore's psychological symptoms with Lexapro, which Moore reported was helpful. Spangler's and Lanthorn's restrictions also are not supported by the opinions of state agency psychologist Leizer and state agency physician Dr. Bockner, who both opined that Moore could perform simple, unskilled work. Also, upon presentation to the emergency department at Norton Community Hospital for suicidal ideations in March 2012, Moore's psychiatric status was deemed "normal" and, later that day, "moderately depressed with a restricted affect," but he had normal attention, memory and thought processes, as well as good judgment. During that same hospitalization, Moore's condition stabilized, and he reported feeling better with medications. Treatment notes from social worker Kegley reveal that Moore's depression was consistently mild, with the exception of being described as moderate on one occasion. In July 2013, nurse practitioner Adams and physician's assistant Skinner both described Moore's

mood and affect as normal, and Skinner further noted that he had normal behavior, judgment and thought content.

Lastly, Moore argues that the ALJ erred by making incomplete findings at step three of the sequential evaluation process. Moore specifically argues that the ALJ did not specify which sections of the Listings she considered, nor did she explain how she determined that his impairments did not meet or equal those Listings. For the reasons that follow, I agree with regard to Moore's physical impairments, but not his mental impairments.

It is well-settled that "ALJs have a duty to analyze 'all of the relevant evidence' and to provide a sufficient explanation for their 'rationale in crediting certain evidence.'" *Bill Branch Coal Corp. v. Sparks*, 213 F.3d 186, 190 (4th Cir. 2000) (citations omitted). "Judicial review of an administrative decision is impossible without an adequate explanation of that decision by the administrator." *DeLoatch v. Heckler*, 715 F.2d 148, 150 (4th Cir. 1983). Therefore, judicial review may be impossible, and remand necessary, if (1) the ALJ "fail[s] to make requisite findings or to articulate the bases for his conclusions," *DeLoatch*, 715 F.2d at 150; and (2) the record provides an inadequate explanation of the Commissioner's decision, *Meyer v. Astrue*, 662 F.3d 700, 707 (4th Cir. 2011) (citing *DeLoatch*, 715 F.2d at 150) (explaining that judicial review is possible so long as the record provides an adequate explanation of the Commissioner's decision)). Here, with regard to Moore's mental impairments, he simply is incorrect that the ALJ did not specify the Listings considered or explain her findings as to why his impairments did not meet or equal those Listings. In fact, a review of the ALJ's decision reveals that she set forth a rather detailed analysis in this regard. In her decision, the ALJ stated that she was considering Listing §§ 12.02, 12.04, 12.05 and 12.06. (R. at

58.) She then proceeded to explain in detail why Moore's impairments did not meet the criteria for each of these Listings. (R. at 58-59.) Therefore, I find this argument to be without merit.

With regard to Moore's physical impairments, however, I agree that the ALJ erred. The ALJ simply stated that the "appropriate sections of the Listings" had been considered, but the objective medical evidence of record did not support a conclusion that Moore's physical impairments were of listing-level severity. (R. at 58.) This court has held that a "remand is not warranted … 'where it is clear from the record which [L]isting … was considered, and there is elsewhere in the ALJ's opinion an equivalent discussion of the medical evidence relevant to the [s]tep [t]hree analysis which allows [the reviewing court] readily to determine whether there was substantial evidence to support the ALJ's [s]tep [t]hree conclusion.'" *Meador v. Colvin*, 2015 WL 1477894, at *3 (W.D. Va. Mar. 27, 2015) (quoting *Schoofield v. Barnhart*, 220 F. Supp. 2d 512, 522 (D. Md. 2002)). However, a "sweeping, naked conclusion" by an ALJ that a claimant's impairment does not meet or equal a Listing does not constitute a sufficient step three analysis. *Schoofield*, 220 F.Supp. 2d at 520. I find that this is the case here. The ALJ made very specific mention of the Listings considered and made a detailed analysis of whether Moore's mental impairments met or equaled those Listings, but, with regard to his physical impairments, she merely stated that she had considered the "appropriate sections," and they had not been met. The ALJ did not even make reference to the evidence contained in her step four residual functional capacity analysis of Moore. I find that this is the kind of "sweeping, naked conclusion" found insufficient in *Schoofield*.

Based on the above reasoning, I conclude that substantial evidence does not support the ALJ's step three analysis with regard to Moore's physical impairments, and I, therefore, further find that substantial evidence does not exist in the record to support the ALJ's conclusion that Moore was not disabled and not entitled to benefits. An appropriate Order and Judgment will be entered.

DATED:     June 1, 2016.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE